**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | Criminal No. 21-30E |
| SHANE HVIZDZAK, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION**

Presently before the Court is Defendant Shane Hvizdzak's Motion to Suppress His June 17, 2020 Statement to Law Enforcement.  (Docket No. 130).  After careful consideration of the Defendant's Motion, the parties' written submissions, the transcript of the suppression hearing and the credible evidence of record adduced at that proceeding, the Motion will be denied for the reasons explained below.

**I.     BACKGROUND**

**A.   Procedural History**

Defendant and his co-defendant are charged in a 65-count Indictment with conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349; wire fraud, in violation of 18 U.S.C. § 1343; and money laundering, in violation of 18 U.S.C. § 1957.  (Docket No. 1).  Specifically, Defendant is charged with one count of conspiracy to commit wire fraud (Count 1), thirty-nine counts of wire fraud (Counts 2-24, 29-37, 39-40 and 49-53), and ten counts of money laundering (Counts 56-65).  (*See id.*).

Following Defendant's arraignment when he pled not guilty to the charges, he requested and was granted a number of extensions of time to file pretrial motions.  Defendant ultimately filed

1

his suppression motion, arguing that the Court should suppress his June 17, 2020 statements to law enforcement, and all evidence obtained from his cell phone and computer, because he was subjected to custodial interrogation, without having received a *Miranda* warning.  (Docket No. 130 at 4-10).  Even absent a *Miranda* violation, Defendant contends that his statements still must be suppressed because they were involuntary.  (*Id.* at 10).

In response, the Government maintains that Defendant was not in custody on June 17, 2020, when he voluntarily spoke with the FBI.  (Docket No. 135 at 1, 10-28).  Additionally, the Government argues that evidence obtained from Defendant's cell phone cannot be suppressed as fruit of the poisonous tree.  (*Id.* at 29).  The Government alternatively contends that the evidence on Defendant's cell phone would have been inevitably discovered via lawful means in conjunction with a valid search warrant such that his suppression motion should be denied in any event.  (*Id.* at 30).

The Court held a suppression motion hearing on May 13, 2024, the official transcript of which was filed of record.  (Docket Nos. 146, 154).  At the Court's direction, the parties submitted post-hearing proposed findings of fact and conclusions of law, followed by each party's response to the opposing party's submission.  (Docket Nos. 158, 159, 160, 161).  After all post-hearing submissions were complete, the Court took the matter under advisement on August 12, 2024.  (*See* Docket No. 162).  The matter is now ripe for disposition.

**B.  Facts**

At the suppression hearing, the Government presented testimony by FBI Special Agents Dianne Shaffer and Brian Burns concerning the events of June 17, 2020.  The Government also entered three exhibits into evidence.  (Docket Nos. 146-1, 146-2, 146-3).  In turn, Defendant

entered two exhibits into evidence, (Docket Nos. 146-4, 146-5), and presented testimony by his father, Peter Hvizdzak.

Before summarizing the testimonial evidence, the Court initially notes that it evaluates the credibility of the witnesses who testified at the hearing consistent with certain well-established principles.  Broadly stated, at a hearing on a motion to suppress, "the credibility of the witnesses and the weight to be given the evidence, together with the inferences, deductions and conclusions to be drawn from the evidence, are all matters to be determined by the trial judge." *United States v. Richardson*, 501 F. Supp. 2d 724, 734 (W.D. Pa. 2007) (citations omitted).  More specifically, as finder of fact, the Court "is free to accept or reject any or all of a witness's testimony." *United States v. Murphy*, 402 F. Supp. 2d 561, 569 (W.D. Pa. 2005) (citation omitted).  To that end, "[c]redibility determinations are to be made in consideration of numerous factors, including the witness's demeanor and manner while on the stand, the witness's ability to accurately recollect the matters at hand, the manner in which the witness may be affected by the outcome, the extent to which the witness's testimony is either supported or contradicted by other evidence and testimony in the case, and, ultimately, the extent to which it withstands a common sense test of reason and logic." *Id.*  Relevant here, a witness' testimony is not to be judged more or less credible because the witness is a law enforcement officer.  *Id.* at 569-70 (citations omitted).

Considering the witnesses' demeanor and testimony in response to the questioning of the attorneys at the suppression hearing, as well as the other salient factors just discussed, the Court finds that they each offered credible testimony concerning their recollection of the events that unfolded on the date in question, despite opposing counsel's respective efforts to impeach them. *See United States v. Garcia*, 521 F. App'x 71, 73 (3d Cir. 2013) ("[W]hen findings are based on determinations regarding the credibility of witnesses . . . for only the trial judge can be aware of

the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said.") (quoting *Anderson v. City of Bessemer,* 470 U.S. 564, 575 (1985)). Accordingly, the Court now turns to the testimony adduced at the suppression hearing, which is fairly summarized as follows.

The Court first observes that Agents Shaffer and Burns each presented as an experienced law enforcement officer, having been employed as a Special Agent with the FBI for approximately 20 years and 25 years, respectively. (Docket No. 154 at 6, 78). Agent Shaffer, who was the lead agent on this case, has been involved with over 100 search warrant executions during her career. (*Id.* at 6-7, 42). Both Agents Shaffer and Burns were present at the residence where the search warrant was executed on June 17, 2020 (hereinafter, the "Hvizdzak residence").[1] (*Id.* at 7, 79).

Prior to the events of June 17, 2020, Agent Burns received information concerning suspicious activity involving an investment fund, which he provided to Agent Shaffer, who in turn opened an investigation. (Docket No. 154 at 78-79). As of June 2020, the investigation had only been underway for about a month, the FBI did not have a full understanding of what had transpired to that point, and investigators were "at the very early stages of gathering information," according to Agent Shaffer. (*Id.* at 7). To that end, the FBI obtained a search warrant for the Hvizdzak residence, which was executed at 7:16 a.m. on June 17, 2020. (*Id.* at 7-8).

In connection with execution of the warrant, eleven law enforcement agents were at the scene, along with four support personnel. (Docket No. 154 at 11, 38-39, 40). Agent Shaffer explained that support personnel arrive after the premises are deemed safe and secure, and they do

---

1    Peter Hvizdzak explained that he and his wife own the Hvizdzak residence and reside there. (Docket No. 154 at 108, 127). Defendant sometimes stayed at the Hvizdzak residence, which was his listed address, and he kept some belongings there, but he also stayed at his girlfriend's house. (*Id.* at 109, 127-28, 129). Defendant typically came to the Hvizdzak residence in the mornings to have breakfast with his parents before going to his office, and he was present when law enforcement agents arrived to execute the search warrant on the morning of June 17, 2020. (*Id.* at 109, 110).

not participate in executing the search warrant.[2] (*Id.* at 40). The search team, which was comprised of four or five agents, approached the front door of the Hvizdzak residence, while the other agents remained in the driveway or around the perimeter of the house for security purposes. (*Id.* at 8, 44-45, 72-73). Agent Shaffer, who was part of the search team,[3] knocked and announced that it was the FBI with a search warrant. (*Id.* at 8-9).

After Agent Shaffer knocked twice, Defendant and his parents opened the door, they were advised that the FBI had a search warrant, and they were asked to step outside. (Docket No. 154 at 9-10, 47). Agent Shaffer's firearm was holstered, although an agent who led the approach to the door may have had a shield and his firearm may have been drawn, which Agent Shaffer testified "would [have been] reasonable." (*Id.* at 9, 10, 43). After Defendant and his parents exited, four or five agents entered the Hvizdzak residence to ensure that it was tactically clear for safety and security purposes, which took approximately five to ten minutes. (*Id.* at 10-11, 48). During that time, Agent Shaffer remained outside with Defendant and his parents, introduced herself, explained that there was a search warrant for the Hvizdzak residence, and advised that no one was under arrest. (*Id.* at 11, 12). Agent Shaffer further indicated that they could go back inside after the house was clear, and they could talk if Defendant was willing to do so. (*Id.* at 13). Agent Shaffer did not point her firearm at Defendant or his parents at this or any other time, nor did she see any other law enforcement agent do so. (*Id.* at 13).

After the Hvizdzak residence was clear, Agent Shaffer asked Defendant if there was somewhere they could talk, and he indicated his willingness to do so by nodding and going into

---

2       Agent Shaffer explained that Defendant would not have seen the support personnel because he was being interviewed by the time they arrived. (Docket No. 154 at 41).

3       Law enforcement personnel at the scene wore t-shirts identifying themselves as FBI agents, whereas Agents Shaffer and Burns wore business suits. (Docket No. 154 at 41, 74).

the house.  (Docket No. 154 at 14).  Agents Shaffer and Burns followed Defendant down to the basement and into a rec room area that was furnished with a couch and a chair.  (*Id.* at 14-15, 48, 80).  Agent Shaffer testified that she did not close the basement door if there was one,[4] and the rec room did not have a door.  (*Id.* at 18).  Once in the rec room, Defendant and Agent Burns sat on the couch separated by the space of a couch cushion, Agent Shaffer sat in a chair two or three feet away, and neither agent was positioned in a such way to prevent Defendant from leaving the rec room.  (*Id.* at 16-17, 72, 81, 82).  Both agents' firearms were holstered and underneath their suit coats.  (*Id.* at 18, 80).

At that point, Agent Shaffer showed Defendant her credentials, re-introduced herself and Agent Burns, explained that they were investigating the High Street Capital fund and would like to gain an understanding of what was going on,[5] and asked Defendant if he was willing to speak with them.  (Docket No. 154 at 18, 55, 56).  Defendant, who was 32 years old at the time and had a bachelor's and a master's degree, responded that they had shut down the prior day,[6] which signaled to Agent Shaffer that he was willing to speak with them.  (*Id.* at 13, 18, 20, 55).  Agent Burns likewise testified that Defendant did not hesitate when he was asked if he was willing to speak with them and characterized him as "very cognizant."  (*Id.* at 81, 88).  Both Agents Shaffer and Burns observed that Defendant appeared to understand what was happening, and there was no indication that he was under the influence of drugs or alcohol.  (*Id.* at 23, 88).

---

4    Agent Shaffer explained that the agents "don't shut doors [during execution of a search warrant].  You want to keep them open."  (Docket No. 154 at 16).

5    Agent Shaffer acknowledged that Defendant was a target of the investigation.  (Docket No. 154 at 50).  Having obtained a search warrant for the Hvizdzak residence, she also acknowledged that there was probable cause to believe that evidence of a crime would be found there.  (*Id.* at 49).  However, Agent Shaffer explained that she "didn't know for sure anything other than that."  (*Id.*).

6    Defendant also asked Agent Shaffer if she could tell him who had provided information about the High Street Capital fund.  (Docket No. 154 at 18-19).

Agent Shaffer informed Defendant that FBI agents, like her and Agent Burns, are information gatherers, and they do not make any decisions about charges. (Docket No. 154 at 19). The information the agents collect is provided to the prosecutor for review, who ultimately decides whether it is presented to a grand jury. (*Id.* at 20).

While interviewing Defendant, Agent Shaffer did not call him a liar, nor did she tell him that she thought he was guilty, that he would be charged, or that he was being placed under arrest. (Docket No. 154 at 19, 26, 37). The agents did not stand over Defendant or gesture toward him in an accusatory fashion, they did not become aggressive or confrontational with him or direct any disparaging comments to him, and they did not frisk, handcuff, restrain, or prevent him from moving. (*Id.* at 20-21, 25-26, 37, 57, 81, 83). Agent Shaffer described the interview as "very pleasant, respectful, [and] conversational," she characterized Defendant as cooperative and observed that he was not agitated or overemotional, and there was no indication that he was unaware of what was happening or unwilling to provide information. (*Id.* at 21, 22-23, 27, 37-38). Likewise, Agent Burns described the interview as "very cordial, very open," and Defendant as "engaging" and "eager" to talk to them, explaining that "[Defendant] did predominantly most of the talking."[7] (*Id.* at 81, 82, 87). Further, Defendant did not ask to use the bathroom, go upstairs, take a break, or stop the questioning, nor did he request food or water or ask for a lawyer. (*Id.* at 21-22, 38, 58, 82).

---

[7]    On cross-examination, Agent Shaffer testified that she was not familiar with the Reid method or technique, while Agent Burns acknowledged that he was familiar with it, describing it as "minimize conduct and let people talk and build rapport." (Docket No. 154 at 52, 89). Agent Burns testified concerning the Reid technique generally, but he explained that it essentially was unnecessary here because it was so early in the investigation. (*Id.* at 90). According to Agent Burns, there was no need to minimize conduct because Defendant was cooperative, and he did not inquire about any potential outcome. (*Id.* at 91-92). Nonetheless, as already stated, Agent Shaffer had informed Defendant that the information the agents collect is provided to the prosecutor, who ultimately decides whether it is presented to a grand jury. (*Id.* at 20).

At some point during the interview, another agent went into the rec room for approximately 20 minutes with Defendant's computer so that Defendant could show the agents something he had discussed.  (Docket No. 154 at 24-25).  That agent sat on the couch next to Defendant because they were sharing the computer screen.  (*Id.* at 25).  The agent was not confrontational with Defendant and interacted with him in the same manner as Agents Shaffer and Burns.[8]  (*Id.* at 24).

 As the interview was concluding, Defendant indicated a desire to cooperate moving forward.[9]  (Docket No. 154 at 27).  At that point, Agent Shaffer offered Defendant the opportunity to write out a statement if he wished to do so, and Defendant agreed without any hesitancy.  (*Id.* at 27-28, 59, 60-61).  In response to Defendant's inquiry about how to start the statement, Agent Shaffer explained that he could provide information about himself, such as his age and educational level, and specify that he was voluntarily making a statement about the topics he discussed with the agents during the interview.  (*Id.* at 28).  Agent Shaffer further explained that whatever Defendant wanted to say in the statement needed to be truthful.  (*Id.* at 29).  She did not tell Defendant what to say concerning the factual statements and description of what occurred, but they talked about some things that he wanted to say related to the matters they discussed.  (*Id.* at 30-31, 62).  After that, Defendant wrote out a statement, which was admitted into evidence at the suppression hearing as Government Exhibit 1.  (*Id.* at 29-30).  After Defendant completed writing the statement, Agent Shaffer asked him to read it aloud and make any changes or corrections that

---

8       Other than Agents Shaffer and Burns, the agent with the computer was the only other member of law enforcement who interacted with Defendant during the interview.  (Docket No. 154 at 70-71).  Other agents came down to the basement on three or four occasions to ask Agent Shaffer a question concerning execution of the search warrant, but those agents did not interact with Defendant.  (*Id.* at 71).  Additionally, Agent Shaffer went upstairs to address a question concerning the search warrant, and Agent Burns twice went upstairs to retrieve certain items that Defendant identified.  (*Id.* at 25, 83-84).  On those occasions, neither Agent Shaffer nor Agent Burns noticed any issues with Defendant's parents.  (*Id.* at 25, 71, 84).

9       Agent Shaffer conceded that she was seeking Defendant's cooperation during the interview, and she was hopeful that he would assist with the investigation.  (Docket No. 154 at 33).

he wanted to make, which he did, as shown by certain initialed items on the written statement.[10] (*Id.* at 30, 63, 85-86).  Agent Shaffer indicated that Defendant should sign the statement, and she and Agent Burns also signed it as witnesses.  (*Id.* at 30, 31, 63, 85).  The written statement portion of the interview took approximately 15 minutes.  (*Id.* at 31).

All told, the agents' interview with Defendant lasted approximately four hours, and it appeared to Agent Shaffer that Defendant would have kept talking had she not wrapped up. (Docket No. 154 at 22).  Agent Burns also explained that the interview lasted nearly four hours because Defendant continued to disclose information.  (*Id.* at 86).  At the conclusion of the interview, Defendant was not placed under arrest, and he remained at the Hvizdzak residence.[11] (*Id.* at 32, 87).

Agent Shaffer called Defendant the following week and left a voicemail message asking if he could return her call because she had a question concerning a spreadsheet they had discussed. (Docket No. 154 at 34).  Defendant returned Agent Shaffer's call and indicated a willingness to continue speaking.  (*Id.* at 34-35).  Agent Shaffer and Defendant subsequently exchanged e-mails dated June 23, 2020, in which he stated that he would send her another spreadsheet that he was working on.  (*Id.* at 35).  The e-mails were entered into evidence at the suppression hearing as Government Exhibits 2 and 3.  (Docket Nos. 146-2; 146-3).  Agent Shaffer and Defendant scheduled an appointment on June 25, 2020, but that meeting did not occur because Agent Shaffer

---

[10]     Agent Shaffer testified that Defendant incorrectly dated the statement May 17, 2020, instead of June 17, 2020.  (Docket No. 154 at 32).

[11]     When the interview concluded, Agent Shaffer offered to speak with Defendant's parents to explain what had occurred, and he indicated that he would like her to do so.  (Docket No. 154 at 32-33, 64).  She then had a brief conversation with Defendant's parents and explained that the agents had a much better understanding of what happened with the fund after speaking with Defendant, and that he was willing to help them resolve the matter. (*Id.* at 33-34).  The conversation between Agent Shaffer and Defendant's parents was non-confrontational and respectful. (*Id.*).

received a phone call the day prior from an attorney who Defendant had retained.  (Docket No. 154 at 36).

Moving on, Peter Hvizdzak testified that Defendant's Exhibit 1 was a photograph which accurately depicted the front of the Hvizdzak residence on June 17, 2020.  (Docket Nos. 146-4; 154 at 115).  Mr. Hvizdzak testified that he and his wife, along with Defendant, were present there on the morning of June 17, 2020 at approximately 7:15 a.m., when they heard knocking at the door and heard someone say, "FBI."  (Docket No. 154 at 108-09, 111-12).  Mr. Hvizdzak opened the door, stepped outside, saw agents, including one agent with a ballistic shield and a firearm pointed in his direction, and continued walking along followed by his wife and Defendant, as they were instructed.  (*Id.* at 113, 116, 118).  They were advised that the agents had a search warrant for the Hvizdzak residence, and they waited outside for approximately 15 minutes while three or four agents went into the residence before they were told to go back inside.  (*Id.* at 117, 118-19).  According to Mr. Hvizdzak, a couple agents stayed in the living room with he and his wife, while Defendant was "led to the basement by two - - a man and a woman that were in dress clothes."[12] (*Id.* at 120).

Mr. Hvizdzak testified that Defendant's Exhibit 2 was a photograph that accurately depicted the living room in the Hvizdzak residence on June 17, 2020, where he and his wife remained with two agents for approximately five hours while the search warrant was executed. (Docket Nos. 146-5; 154 at 121-22).  During this time, the agents made small talk with Mr.

---

12    Mr. Hvizdzak's testimony on this point conflicts with Agents Shaffer and Burns, who both testified that they followed Defendant down to the basement and into the rec room area.  (Docket No. 154 at 14-15, 80).  Although the Court finds that each witness credibly testified concerning their recollection of the events that occurred during execution of the search warrant, the Court also recognizes that individual witnesses sometimes have differing recollections of the same event.  In this instance, the Court finds that the agents consistently and credibly testified that they followed Defendant to the basement and into the rec room area.  Even if there is some discrepancy on this point, it does not alter the Court's ultimate conclusion that Defendant was not in custody when he was interviewed for all of the reasons discussed in Parts II.B and II.C., *infra*.

Hvizdzak and his wife, and they did not display any firearms.  (Docket No. 154 at 122).  According to Mr. Hvizdzak, the agents instructed them to place their cell phones on the table and put them in airplane mode.  (*Id.* at 122-23).  They were not allowed to use their phones, but Mr. Hvizdzak's wife was permitted to send a text message to advise her boss that she would not be at work that day.  (*Id.* at 123).  Mr. Hvizdzak did not leave the living room while the search warrant was executed, but his wife was escorted to and from the restroom on one occasion.  (*Id.* at 122, 123).  When asked if they could depart the residence, Mr. Hvizdzak and his wife were told that if they did so, they could not return while the warrant was being executed.  (*Id.* at 123, 130).  However, Mr. Hvizdzak conceded that the agents did not prevent them from leaving the Hvizdzak residence.  (*Id.* at 130).  Additionally, Mr. Hvizdzak acknowledged that the agents were professional, and they did not restrain, mistreat, or disrespect him or his wife.  (*Id.* at 130-31).

While Mr. Hvizdzak and his wife were in the living room, Defendant was in the basement with two agents.  (Docket No. 154 at 124).  Mr. Hvizdzak did not hear any noise or shouting coming from the basement, and Defendant was not agitated or upset when he came upstairs.  (*Id.* at 124, 130, 132).  Finally, before leaving the Hvizdzak residence, Agent Shaffer had a brief, cordial conversation with Mr. Hvizdzak to explain what had occurred.  (*Id.* at 132).

It the Court's estimation, the foregoing fairly summarizes the witnesses' testimony adduced and the documentary evidence admitted at the suppression hearing.  Accordingly, with this background, the Court turns to analyze Defendant's suppression claims.

II.  <u>**MOTION TO SUPPRESS STATEMENTS TO LAW ENFORCEMENT**</u>

Defendant argues that his statements to law enforcement should be suppressed because he was subjected to custodial interrogation when he was interviewed by Agents Shaffer and Burns, without having received a *Miranda* warning, and his statements otherwise were not voluntary.  The

Government counters that a *Miranda* warning was not necessary because Defendant was not in custody or restrained in any way.   Moreover, the Government maintains that Defendant's statements were knowing and voluntary.   On the facts of this case, the Court finds that Defendant was not in custody when he was interviewed by Agents Shaffer and Burns, therefore *Miranda* was not implicated, and no Fifth Amendment violation occurred.   The Court further finds that Defendant's statements were voluntary, thus suppression is not warranted.

A.   **Legal Standard – Fifth Amendment**

The Fifth Amendment provides that "[n]o person shall be . . . compelled in any criminal case to be a witness against himself."  U.S. CONST. amend. V.  To advance this legal protection, in *Miranda v. Arizona,* 384 U.S. 436, 444 (1966)*,* the Supreme Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination."  Consequently, a defendant who "has been taken into custody or otherwise deprived of his freedom of action in any significant way" must be given the warnings prescribed in *Miranda*, including the right to remain silent and the right to counsel. *Id.* at 444, 468-70.   These warnings are required because custodial interrogation involves "inherently compelling pressures."  *Id.* at 467.

"As a general rule, the burden of proof is on the defendant who seeks to suppress evidence." *United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995).  When a defendant seeks to suppress statements, he satisfies his initial burden "if he alleges that he was subjected to custodial questioning without the benefit of *Miranda* warnings, at which point the government must prove by a preponderance of the evidence that there was no custodial interrogation implicating *Miranda*, there was some exception to the *Miranda* rule, or . . . [the defendant] . . . was

properly *Mirandized* and waived his rights." *United States v. Valenta*, Crim. No. 15-161, 2017 WL 2131375, at *4 (W.D. Pa. May 17, 2017) (internal quotation marks and citation omitted).

There is no dispute that Defendant was not advised of his *Miranda* rights before he was interviewed by Agents Shaffer and Burns and made oral and written statements. Therefore, the issue before the Court is whether the recitation of such rights was necessary, *i.e.*, whether Defendant was subjected to custodial interrogation at the time he made any allegedly incriminating statements.

Custodial interrogation means "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444. A person is in custody when he either is formally arrested or his freedom of movement is restricted to "the degree associated with a formal arrest." *United States v. Willaman*, 437 F.3d 354, 359 (3d Cir. 2006). If a person has not been formally arrested when the statement in question is made, "something must be said or done by the authorities, either in their manner of approach or in the tone or extent of their questioning, which indicates that they would not have heeded a request to depart or to allow the suspect to do so." *Id.* (quoting *Steigler v. Anderson*, 496 F.2d 793, 799 (3d Cir. 1974)). Therefore, law enforcement officers "are not required to administer *Miranda* warnings to everyone whom they question." *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977).

The determination of whether statements are the product of custodial interrogation must be made on a case-by-case basis. *United States v. Leese*, 176 F.3d 740, 743 (3d Cir. 1999). As the Third Circuit Court of Appeals has instructed, "[t]o determine whether an individual was in custody, we first establish 'the circumstances surrounding the interrogation.' " *United States v. Ludwikowski*, 944 F.3d 123, 131 (3d Cir. 2019) (quoting *United States v. Jacobs*, 431 F.3d 99, 105

(3d Cir. 2005)).  Next, "we ask, as an objective matter, whether 'a reasonable person [would] have felt that he or she was not at liberty to terminate the interrogation and leave.' " *Id.* (quoting *Jacobs*, 431 F.3d at 105); *see also Stansbury v. California*, 511 U.S. 318, 323 (1994) ("[T]he initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned."). In other words, the Court must assess whether there was a "restraint on freedom of movement of the degree associated with a formal arrest." *Ludwikowski*, 944 F.3d at 131 (citation omitted).  As the Supreme Court has instructed, "the freedom-of-movement test identifies only a necessary and not a sufficient condition for *Miranda* custody." *Howes v. Fields*, 565 U.S. 499, 509 (2012) (quoting *Maryland v. Shatzer*, 559 U.S. 98, 112 (2010)).  Therefore, the Court must assess "whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *Ludwikowski*, 944 F.3d at 131 (quoting *Howes*, 565 U.S. at 509).

The Supreme Court has identified the following factors relevant to determining whether a reasonable person in a defendant's circumstances would have felt free to go: the location of the questioning; its duration; statements made during the interview; the presence or absence of physical restraints during the questioning; and the release of the interviewee at the end of the questioning. *Howes*, 565 U.S. at 509.  The Third Circuit Court of Appeals similarly has identified a number of factors for courts to consider in the custody analysis including: (1) whether the officers told the suspect he was under arrest or free to leave; (2) the location or physical surroundings of the interrogation; (3) the length of the interrogation; (4) whether the officers used coercive tactics such as hostile tones of voice, the display of weapons, or physical restraint of the suspect's movement; and (5) whether the suspect voluntarily submitted to questioning. *Willaman*, 437 F.3d

at 359-60.   Additional factors deemed important by the Third Circuit include "whether the questioner believed the interviewee was guilty; whether the interviewee was specifically told he was not under arrest; and whether he agreed to meet knowing that he would be questioned about a criminal offense." *Ludwikowski*, 944 F.3d at 132 (citing *Jacobs*, 431 F.3d at 105-06).

To reiterate, the custody determination depends on the objective circumstances of the interrogation, *see Stansbury*, 511 U.S. at 323, meaning whether a reasonable person in Defendant's position would have felt free to terminate the interview and leave.  We must analyze this question by considering the totality of the circumstances presented on the facts of this case.

### B.  Circumstances Surrounding Defendant's Interview

First, we must "establish 'the circumstances surrounding the interrogation.' "[13] *Ludwikowski*, 944 F.3d at 131 (quoting *Jacobs*, 431 F.3d at 105).  Before Defendant's interview began on June 17, 2020, agents arrived at the Hvizdzak residence at 7:16 a.m. to execute a search warrant.  (Docket No. 154 at 7-8).  In total, eleven law enforcement agents and four support personnel were on the scene.  (*Id.* at 11, 38-39, 40).  Four or five agents approached the front door, while other agents remained in the driveway or around the perimeter of the house for security purposes.  (*Id.* at 8, 44-45, 72-73).  After Agent Shaffer knocked and announced that it was the FBI with a search warrant, Defendant and his parents answered the door and were asked to step outside.  (*Id.* at 8-10, 47).  At that time, Agent Shaffer's firearm was holstered, but an agent who led the approach to the door may have had a shield and his firearm may have been drawn, which Agent Shaffer testified "would [have been] reasonable."  (*Id.* at 9, 10, 43).  Four or five agents entered the Hvizdzak residence to ensure that it was tactically clear, which took approximately

---

13       The circumstances surrounding Defendant's interview are thoroughly described in Part I.B., *supra*.  Nevertheless, the Court will recount the salient circumstances, consistent with Third Circuit precedent emphasizing the importance of setting the scene.  *See Jacobs*, 431 F.3d at 105.

five to ten minutes, while Agent Shaffer remained outside with Defendant and his parents, introduced herself, and explained that there was a search warrant, but no one was under arrest. (*Id.* at 10-11, 12, 48). Agent Shaffer explained that they could go back inside after the house was clear and talk if Defendant was willing to do so. (*Id.* at 13).

After the Hvizdzak residence was clear, Agent Shaffer asked Defendant if there was somewhere they could talk, and he indicated his willingness to do so by nodding and going into the house. (Docket No. 154 at 14). Agents Shaffer and Burns followed Defendant down to the basement and into a rec room area. (*Id.* at 14-15, 48, 80). If there was a basement door, Agent Shaffer did not close it, and there was no door to the rec room. (*Id.* at 18). During the interview, Defendant and Agent Burns sat on a couch separated by a seat cushion, and Agent Shaffer sat in a chair two or three feet away. (*Id.* at 16-17). Both agents' firearms were holstered and underneath their suit coats, and the agents did not restrain Defendant or position themselves in a way to prevent him from leaving the rec room. (*Id.* at 18, 21, 72, 80, 81, 82). Only one other agent had a 20-minute, non-confrontational interaction with Defendant to review something on his computer. (*Id.* at 24-25, 70-71). The agents did not call Defendant a liar, they did not tell him that they thought he was guilty or that he would be charged, and they were not physically or verbally aggressive or confrontational with him. (*Id.* at 19-21, 25-26, 37, 57, 81, 83). Defendant's father confirmed that he did not hear any noise or shouting coming from the basement. (*Id.* at 124, 130).

Defendant did not express any hesitancy when he was asked if he was willing to speak with the agents. (Docket No. 154 at 81). Rather, he appeared eager to talk to them, and "[h]e did predominantly most of the talking." (*Id.* at 82). Defendant was cooperative, he was not agitated or overemotional, and he did not ask to use the bathroom, go upstairs, take a break, or stop the questioning, nor did he request food or water or ask for a lawyer. (*Id.* at 21-22, 23, 38, 58, 82).

Toward the end of the interview, Defendant indicated a desire to cooperate moving forward. (Docket No. 154 at 27). At that point, Agent Shaffer offered Defendant the opportunity to write out a statement if he wished, and he elected to do so without any hesitancy. (*Id.* at 27-28, 29-30, 59, 60-61). The written statement portion of the interview took approximately 15 minutes. (*Id.* at 31). All told, the agents' interview with Defendant lasted nearly four hours, and it appeared to Agent Shaffer that Defendant would have kept talking when she began to wrap up. (*Id.* at 22). When the interview concluded, Defendant was not placed under arrest, and he remained at the Hvizdzak residence. (*Id.* at 32, 87).

### C. A Reasonable Person Would Have Felt Free to Terminate the Interview and Leave

With "the scene . . . set," *Jacobs*, 431 F.3d at 105 (citation omitted), the Court turns to the second step of the custodial interrogation analysis and analyzes whether a reasonable person in Defendant's circumstances would have felt free to terminate the interview and go. As discussed, this analysis is guided by the factors enunciated in *Howes* and in *Willaman*.

#### 1. Agent Shaffer Told Defendant He Was Not Under Arrest, and He Was Not Arrested When the Interview Concluded

To start, the Court acknowledges that Defendant and his parents initially encountered numerous law enforcement agents who were present to execute the search warrant at the Hvizdzak residence.[14] With that said, when Agent Shaffer first encountered Defendant and his parents outside while the residence was being cleared, she immediately advised them that no one was

---

[14]      Contrary to Defendant's assertion that the presence of 15 agents / support personnel "created a police-dominated atmosphere weighing in favor of custody," (Docket No. 159 at 11, ¶ 18), "[i]t is commonplace for numerous agents to be present to execute a search warrant." *United States v. Jones*, Crim. No. 11-261, 2011 WL 4011406, at *5 (E.D. Pa. Sept. 8, 2011) (finding that "cadre of law enforcement officials in [the defendant's] home, though coercive in nature, does not render their interaction with [him] a custodial interrogation" where "the bulk of the agents" were present to search the premises and the defendant was questioned by "a smaller number of agents"); *see also United States v. Kofsky*, Crim. No. 06-392, 2007 WL 2480971, at *27 (E.D. Pa. Aug. 28, 2007) (finding no custodial interrogation where the defendant's home was searched by 23 agents, and observing that "[t]he presence of armed and uniformed agents . . . [is a] characteristic[] of many searches and do[es] not create a custodial interrogation per se").

under arrest. (Docket No. 154 at 12). This factor weighs in favor of finding that Defendant was not in custody when the agents interviewed him. *See Mathiason*, 429 U.S. at 495 (defendant being "immediately informed that he was not under arrest" is a factor indicating noncustodial questioning). Defendant criticizes that Agent Shaffer "did not explain what it meant to not be under arrest," (Docket No. 159 at 12, ¶ 22), but he cites no legal authority requiring that she must do so. He further complains that no one told him "that he did not have to answer questions, that he could terminate the interrogation at any time, or that he could simply leave." (*Id.*). Contrary to Defendant's position, "[w]hile [the agents] did not tell [Defendant] that he was free to leave or that he did not need to answer their questions, this fact does not necessarily prove the interview was custodial." *United States v. Sater*, 477 F. Supp. 3d 372, 381 (M.D. Pa. Aug. 7, 2020) (citing *United States v. King*, 604 F.3d 125, 138 (3d Cir. 2010) (finding a suspect was not in custody where he was told he was not under arrest, but was not told he was free to leave)); *see also United States v. Ingino*, 845 F. App'x 135, 138 n.1 (3d Cir. 2021) ("Although the troopers did not explicitly tell [the defendant] he was 'free to leave,' they did not have to speak magic words for it to be clear that he was not under arrest and was free to leave."). Finally, the fact that Defendant was not arrested immediately after the interview concluded also lends support to a non-custodial finding. *See Howes*, 565 U.S. at 509; *Jacobs*, 431 F.3d at 106-07 (3d Cir. 2005) (leaving interview without hindrance at end of questioning can be "an indicator of what the circumstances during the questioning would have made a reasonable person believe").

### 2.  The Agents Interviewed Defendant at the Hvizdzak Residence in a Non-Confrontational Setting

"When a person is questioned on his own turf, . . . the surroundings are not indicative of the type of inherently coercive setting that normally accompanies a custodial interrogation." *Willaman*, 437 F.3d at 360 (quoting *United States v. Czichray*, 378 F.3d 822, 826 (8th Cir. 2004));

*United States v. Killingsworth*, 118 F. App'x 649, 651 (3d Cir. 2004) ("[A]n interrogation in familiar surroundings such as one's home softens the hard aspects of police interrogation and moderates a suspect's sense of being held in custody.") (citation omitted). Although an in-home interview does not automatically equate to a non-custodial finding, the circumstances surrounding the location and environment of Defendant's interview as recounted above demonstrate that he was not in custody. As discussed, Defendant led the agents to the rec room, which did not have a door. Defendant and Agents Shaffer and Burns were seated during the interview, and the agents were not positioned in a way to prevent Defendant from leaving the rec room. Only one other agent interacted with Defendant for 20 minutes concerning his computer, none of the three agents who interacted with Defendant were verbally confrontational or physically menacing toward him, and the atmosphere of the interview was cordial throughout.

**3.   The Four-Hour Interview Was Non-Custodial Given the Circumstances**

Although the agents' interview with Defendant lasted approximately four hours, (Docket No. 154 at 22), courts have found "interrogations lasting anywhere from one and one-half to seven hours to be non-custodial." *Killingsworth*, 188 F. App'x at 651-52 (collecting decisions). Accordingly, the length of the interview here does not establish that Defendant was in custody, particularly given that "[Defendant] did predominantly most of the talking," the interview lasted as long as it did because he continued to disclose information, and it appeared that he would have kept talking when Agent Shaffer began wrapping up the interview. (Docket No. 154 at 22, 82, 86).

### 4.  **The Agents did not Restrain Defendant or Use Coercive Tactics**

Defendant was not handcuffed or physically restrained at any point during the interview.[15] (Docket No. 154 at 21, 37, 83).  Agents Shaffer and Burns, who were dressed in business suits, did not stand over Defendant or gesture toward him in an accusatory fashion, they were not aggressive or confrontational with him, they did not make any disparaging comments or threaten him, they did not interact with him in a hostile or coercive manner, and they did not display their weapons at any point.  (*Id.* at 18, 20-21, 25-26, 37, 41, 57, 80, 81, 83).  Moreover, both Agents Shaffer and Burns described Defendant as pleasant and cooperative throughout the interview, (*id.* at 21, 23, 27, 81), which suggests that he was not overcome by any coercive tactics by law enforcement.  *See United States v. Vidal*, 85 F. App'x 858, 862 (3d Cir. 2004) (concluding that the defendant was not overcome by coercive tactics where, *inter alia*, "he appeared to be calm and was cooperative throughout the questioning").  Defendant's father confirmed that he did not appear distressed when he came upstairs after the interview.  (Docket No. 154 at 132).

Despite the absence of a coercive atmosphere, Defendant argues that the agents employed coercive interrogation tactics "to essentially deceive [him] into making incriminating statements without realizing the negative consequences of doing so."  (Docket No. 161 at 4).  As examples, Defendant points to the agents separating him from his parents, minimizing his misconduct, and presenting him with an "opportunity" to write a statement.  (*Id.*).

It is generally recognized "that [law enforcement] may use some psychological tactics in eliciting a statement from a suspect," such as "play[ing] on the suspect's sympathies or

---

15      Nonetheless, it stands to reason that Defendant was not entirely free to move about the Hvizdzak residence while the search was ongoing in order to ensure that there was no interference with the warrant execution process. Still, the Court finds that Defendant could have terminated the interview and left the Hvizdzak residence considering that he could have gone to his girlfriend's house where he stayed at least part of the time according to his father's testimony.  *See supra*, n. 1.

explain[ing] that honesty might be the best policy for a criminal who hopes for leniency from the state." *Miller v. Fenton*, 796 F.2d 598, 605 (3d Cir. 1986).  In employing such tactics, "[l]aw enforcement agents are not prohibited from . . . actively misleading a defendant in order to obtain a confession, so long as it remains possible for the defendant to make a rational decision." *United States v. Gedeon*, Crim. No. 21-210, 2023 WL 4554972, at *6 (E.D. Pa. July 14, 2023) (citing *Frazier v. Cupp*, 394 U.S. 731, 739 (1969) (police misrepresentation to a defendant that his cousin had confessed was insufficient to make the otherwise voluntary confession inadmissible)).  Given that certain interrogation tactics are permissible, even if the agents somehow attempted to "minimize conduct," as Defendant suggests, and/or build rapport with him, those actions do not establish that they pressured or coerced him to make any inculpatory statements.  *See Miller*, 796 F.2d at 607 (holding that a suspect's confession was not involuntary despite the fact that "[the officer's] supportive, encouraging manner was an interrogation tactic aimed at winning [the suspect's] trust and making him feel comfortable about confessing").

### 5.  <u>Defendant Voluntarily Submitted to Questioning</u>

Defendant's current claim that he did not voluntarily submit to questioning is contradicted by the evidence of record.  To repeat, when Agent Shaffer explained that the agents were investigating the High Street Capital fund, he conveyed his willingness to speak with the agents by responding that they had shut down the prior day.  (Docket No. 154 at 18, 20, 55).   Agent Burns confirmed that Defendant did not hesitate when he was asked if he was willing to speak with them, and Agent Shaffer described him as cooperative.  (*Id.* at 23, 81).  As discussed, Defendant was "engaging" and "eager" to talk with the agents, and "[h]e did predominantly most of the talking."  (*Id.* at 82, 87).  Further, Defendant never asked to take a break or stop the questioning.  (*Id.* at 21-22, 38, 58, 82).  Finally, when Agent Shaffer wrapped up the interview, it

was her impression that Defendant would have kept talking.  (*Id.* at 22).  This evidence firmly establishes that Defendant voluntarily participated in the interview[16] and weighs in favor of a non-custodial finding.

### 6.  Other Relevant Factors Show That Defendant Was Not In Custody

As noted, other factors the Third Circuit deems important to the custody analysis include "whether the questioner believed the interviewee was guilty; whether the interviewee was specifically told he was not under arrest; and whether he agreed to meet knowing that he would be questioned about a criminal offense."  *Ludwikowski*, 944 F.3d at 132 (citing *Jacobs*, 431 F.3d at 105-06).  None of these considerations show Defendant was in custody under the facts of this case.

As to the first factor, when officers have "more cause for believing the suspect committed the crime," there is a "greater tendency to bear down in interrogation and create the kind of atmosphere of significant restraint that triggers *Miranda*."  *Jacobs*, 431 F.3d at 105 (quoting *Steigler*, 496 F.2d at 799).  Here, while Agent Shaffer acknowledged that Defendant was a target of the investigation and obtained a search warrant for the Hvizdzak residence, signifying there was probable cause to believe that evidence of a crime would be found there, she "didn't know for sure anything other than that."  (Docket No. 154 at 49).  Furthermore, Agent Shaffer never called Defendant a liar, told him that she thought he was guilty, or told him that he would be charged.[17]

---

16      For the reasons discussed, the evidence similarly shows that Defendant voluntarily made a written statement, despite his contention that the agents "told him what to include." (Docket No. 159 at 7, ¶ 32). Contrary to Defendant's characterization of the evidence, Agent Shaffer credibly testified that she did not tell Defendant what to say concerning the factual statements and description of what occurred, but they talked about some things that he wanted to say concerning what they discussed. (Docket No. 154 at 30-31, 62). Under those circumstances, any suggestion that Defendant's written statement was coerced or involuntary is without merit. *See United States v. Bogle*, Crim. No. 08-335, 2009 WL 1064473, at *9 (W.D. Pa. Apr. 20, 2009) (finding written statement voluntary where agent "made suggestions to defendant as to how to structure the statement, [but] there [was] no evidence that he ordered or directed defendant to admit that he had accessed numerous sites containing child pornography").

17      There is no evidence here that the agents "repeatedly expressed their collective belief that [the defendant] was guilty" and "supported this belief with multiple references to substantial evidence." *United States v. Beasley*, Crim. No. 20-361, 2023 WL 5984285, at *18 (E.D. Pa. Sept. 14, 2023). Consequently, there is no basis to conclude that the agents' "views and beliefs were clearly 'manifested to the individual under interrogation and would have

(*Id.* at 19, 26).   In light of these circumstances, any belief the agents may have had about Defendant's potential culpability does not demonstrate that he was in custody.  *Cf. Beasley*, 2023 WL 5984285, at *20 (concluding that agents' numerous statements unequivocally expressing their belief that the defendant was guilty, in conjunction with documentary evidence presented to him, played a "large role" in finding that he was subject to custodial interrogation).

Next, as already discussed, Agent Shaffer told Defendant that no one was under arrest when she initially spoke with him outside the Hvizdzak residence while it was being cleared.  (Docket No. 154 at 12).  Moreover, Agent Shaffer never told Defendant that he was being placed under arrest during the interview, and he was not arrested when the interview concluded, (*id.* at 37, 87), which shows that he was not in custody.

Finally, the Court considers whether Defendant agreed to speak with the agents knowing that he would be questioned about a criminal offense.  Relevant here, at the outset of the interview when Agent Shaffer explained that they were investigating the High Street Capital fund and inquired whether Defendant was willing to speak with them, he immediately responded that they had shut down the prior day.  (Docket No. 154 at 18, 55).  Defendant also asked Agent Shaffer if she could tell him who had provided information about the fund.  (*Id.* at 18-19).  Defendant's comment about shutting down and inquiry about the information source show his apparent awareness that the fund, and his involvement with it, were to be the focus of any ensuing discussion.  Accordingly, although the agents did not specifically mention that they were investigating a particular criminal offense, Defendant's knowledge concerning the subject matter of the interview, before it occurred, leans toward a non-custodial finding.

In summary, considering all of the relevant factors, the Court finds that a reasonable person

---

affected how a reasonable person in that position would perceive his or her freedom to leave.' " *Id.* at *20 (quoting *Stansbury*, 511 U.S. at 325).

in Defendant's situation would have felt free to terminate the interview and leave.  Hence, there was not a "restraint on freedom of movement of the degree associated with a formal arrest." *Ludwikowski*, 944 F.3d at 131 (citation omitted).  However, given that the Supreme Court has "decline[d] to accord talismanic power to the freedom-of-movement inquiry," the Court further finds that the environment of Defendant's interview did not present "the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*."  *Howes*, 565 U.S. at 509 (internal quotation marks and citation omitted).  Therefore, under the totality of the circumstances, the Court concludes that Defendant was not in custody when Agents Shaffer and Burns interviewed him, thus a *Miranda* warning was not required.

### D.  <u>Defendant's Statements Were Voluntary</u>

Even absent a *Miranda* violation, the Court still must determine whether Defendant's statements were voluntary.  *See United States v. Swint*, 15 F.3d 286, 288-89 (3d Cir. 1994) (treating custody and voluntariness as separate inquiries).  A statement is involuntary when the suspect's "will was overborne in such a way as to render his confession the product of coercion."  *Arizona v. Fulminante*, 499 U.S. 279, 288 (1991).  Whether a statement is voluntarily made is determined from "the totality of all the surrounding circumstances - both the characteristics of the accused and the details of the interrogation."  *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973).

The Government has the burden of establishing, by a preponderance of the evidence, that a challenged statement was voluntary.  *See Lego v. Twomey*, 404 U.S. 477, 489 (1972); *Ludwikowski*, 944 F.3d at 135 (citation omitted).  Relevant factors to consider in evaluating voluntariness include "the youth of the accused; his lack of education or his low intelligence; the lack of any advice to the accused of his constitutional rights; the length of detention; the repeated and prolonged nature of questioning; and the use of physical punishment such as the deprivation

of food or sleep." *Miller*, 796 F.2d at 604 (quoting *Schneckloth*, 412 U.S. at 226).  Additionally, "[a] suspect's background and experience, including prior dealings with the criminal justice system, should be taken into account in the voluntariness inquiry." *Jacobs*, 431 F.3d at 108 (citations omitted).  The overriding question in evaluating voluntariness is whether the law enforcement officer's tactics and statements "were so manipulative or coercive that they deprived [the defendant] of his ability to make an unconstrained, autonomous decision to confess." *Miller*, 796 F.2d at 605.

Considering the totality of the circumstances here, the Court concludes that the Government has satisfied its burden of establishing that Defendant's statements were voluntary. Defendant's interview with the agents was conducted in his parents' home, and there is no indication that he was restrained, threatened, or subjected to any form of physical punishment. The interview lasted approximately four hours because Defendant seemed eager to continue providing information.  Although Defendant was not advised of his constitutional rights, a *Miranda* warning was not required because the interview was non-custodial as discussed above. Despite Defendant's lack of prior dealings with the criminal justice system, he was 32 years old and had a bachelor's and a master's degree when he was interviewed.  (Docket No. 154 at 13). Overall, there is nothing in the record indicating that Defendant's age, educational background, intelligence, physical condition, or mental condition in any way limited his ability to voluntarily speak with the agents.  Rather, the credible evidence shows that Defendant was a mature, educated, sophisticated businessperson who presented as "very cognizant" and in no way under the influence of drugs or alcohol.  (*Id.* at 88).

Additionally, the test for voluntariness "generally recognize[s] that [law enforcement] may use some psychological tactics in eliciting a statement from a suspect," such as "play[ing] on the

suspect's sympathies or explain[ing] that honesty might be the best policy for a criminal who hopes for leniency from the state." *Miller*, 796 F.2d at 605. Such tactics "may play a part in the suspect's decision to confess, but so long as that decision is a product of the suspect's own balancing of competing considerations, the confession is voluntary." *Id.* In light of this authority, even if the agents used any tactics geared toward minimizing conduct and/or building rapport with Defendant, the record does not establish that they pressured or coerced him to make any verbal or written statements. *See Frazier*, 394 U.S. at 739 (police misrepresentation to a defendant that his cousin had confessed was insufficient to make the otherwise voluntary confession inadmissible); *Miller*, 796 F.2d at 607 (holding that a suspect's confession was not involuntary despite the fact that "[the officer's] supportive, encouraging manner was an interrogation tactic aimed at winning [the suspect's] trust and making him feel comfortable about confessing"); *Gedeon*, 2023 WL 4554972, at *6 ("Law enforcement agents are not prohibited from employing psychological tactics or actively misleading a defendant in order to obtain a confession, so long as it remains possible for the defendant to make a rational decision."). Consequently, the Court finds that Defendant's oral and written statements to Agents Shaffer and Burns were voluntary under the totality of the circumstances.

## III.   **CONCLUSION**

The Government sustained its burden to show, by a preponderance of the evidence, that Defendant was not in custody when the agents interviewed him on June 17, 2020, therefore *Miranda* was not implicated.[18] The Government likewise sustained its burden to establish, by a

---

[18]   Given this ruling, there is no basis to suppress the evidence obtained from Defendant's cell phone and computer. *See United States v. Caesar*, 2 F.4th 160, 168 n.4 (3d Cir. 2021) ("[T]he 'fruit of the poisonous tree' doctrine does not apply to nontestimonial, physical evidence derived from a suspect's voluntary statements made before officers inform him of his *Miranda* rights.") (citing *United States v. Patane*, 542 U.S. 630, 636 (2004) ("The Self-Incrimination Clause . . . is not implicated by the admission into evidence of the physical fruit of a voluntary statement.")).

preponderance of the evidence, that Defendant's statements were voluntary.  For these reasons, there is no basis to suppress Defendant's oral and written statements made during the interview on June 17, 2020, and his Motion to Suppress, (Docket No. 130), is denied in all respects.

       An appropriate Order follows.

_s/ W. Scott Hardy_
W. Scott Hardy
United States District Judge

Date:   September 11, 2024

cc/ecf:  All counsel of record

27